UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAVID ALAN SCOTT,                           )
                                            )
          Plaintiff,                        )
                                            )
                v.                          )        Case No. 3:16-cv-30126-KAR
                                            )
NANCY A. BERRYHILL,                         )
Acting Commissioner of Social               )
Security Administration,                    )
                                            )
          Defendant.[1]                     )


MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND DEFENDANT'S MOTION FOR ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER
(Dkt. Nos. 13 & 17)

ROBERTSON, U.S.M.J.

## I.      Introduction

Pursuant to 42 U.S.C. § 405(g), Plaintiff David Alan Scott ("Plaintiff") appeals the

decision of the Acting Commissioner of the Social Security Administration ("Commissioner"),

denying his claims for Supplemental Security Income ("SSI") and Social Security Disability

Insurance ("SSDI").  Plaintiff asserts that the Commissioner's decision denying him such

benefits – memorialized in a March 1, 2016 decision by an administrative law judge ("ALJ") – is

in error.  Specifically, Plaintiff alleges that the ALJ erred in his credibility determination

regarding Plaintiff's allegations of back and neck pain and by not assigning controlling weight to

an opinion of Plaintiff's treating therapist.  Plaintiff has moved for judgment on the pleadings,

requesting that the Commissioner's decision be reversed, or, in the alternative, remanded for

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill has been substituted for Carolyn W.
Colvin as Acting Commissioner of the Social Security Administration.

further proceedings (Dkt. No. 13). The Commissioner has moved for an order affirming the decision of the Commissioner (Dkt. No. 17). The parties have consented to this court's jurisdiction (Dkt. No. 12). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the following reasons, the court will deny Plaintiff's motion and allow the Commissioner's motion.

## II.    Procedural Background

Plaintiff applied for SSI and SSDI on March 8, 2015, alleging a June 5, 2013 onset of disability in both applications (Administrative Record ("A.R.") at 246-256, 276). Plaintiff's applications were denied initially and on reconsideration (*id*. at 176-182, 185-190). Plaintiff requested a hearing before an ALJ, and one was held on February 8, 2016 (*id*. at 59-91, 191-93). Following the hearing, the ALJ issued a decision on March 1, 2016, finding that Plaintiff was not disabled and denying Plaintiff's claim (*id*. at 33-54). The Appeals Council denied review on April 1, 2016, and the ALJ's decision became the final decision of the Commissioner (*id*. at 1-6). This appeal followed.

## III.    Legal Standards

### A.    Standard for Entitlement to Social Security Disability Insurance

In order to qualify for SSI and SSDI, a claimant must demonstrate that he is disabled within the meaning of the Social Security Act.[2] A claimant is disabled for purposes of SSI and SSDI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is unable to engage in any substantial

---

[2] For SSDI, the claimant also must demonstrate that the disability commenced prior to the expiration of his insured status for disability insurance benefits. *See* 42 U.S.C. § 423(a)(1).

gainful activity when he "is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated under each statute. *See* 20 C.F.R. §§ 404.1520, 416.920. The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *See id*. *See also Goodermote v. Sec'y of Health & Human Servs*., 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. 20 C.F.R. §§ 404.1520, 416.920.

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work. *See id*. "RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-

3

related physical and mental activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, *Goodermote*, 690 F.2d at 7, including the burden to demonstrate RFC. *Flaherty v. Astrue*, No. 11-11156-TSH, 2013 WL 4784419, at *9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). At step five, the Commissioner has the burden of showing the existence of other jobs in the national economy that the claimant can nonetheless perform. *Goodermote,* 690 F.2d at 7.

   B.  Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *Id.* (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999)). Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)). "While 'substantial evidence' is 'more than a scintilla,' it certainly does not approach the preponderance-of-the-evidence standard normally found in civil cases." *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (citing *Sprague v. Dir. Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 688 F.2d 862, 865 (1st Cir. 1982)). In applying the substantial

evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *Irlanda Ortiz*, 955 F.2d at 769. So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion." *Id*. at 770. That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen*, 172 F.3d at 35.

## IV. Facts

### A. Background

Plaintiff was 52 years old at the time of the ALJ's decision (A.R. at 60). He has a high school education and worked at the same company for 24 years, with his past relevant experience including work as a materials handler, picker, machine operator, receiver, and inspector of packages (*id*. at 60, 88). When he applied for SSI and SSDI, Plaintiff alleged disability due to chronic neck and back pain, chronic fatigue, sleep apnea, gout/chronic foot pain, chronic knee pain/weakness, chronic kidney stones, depression/anxiety/anger, social phobia, post-traumatic stress disorder ("PTSD"), and attention deficit disorder ("ADD") (*id*. at 276). At the hearing, Plaintiff claimed disability as a result of chronic low back pain, degenerative disc disease of the cervical spine as well as cranial nerve disorder/cervical dystonia, chronic kidney stones, a hernia, gout, bipolar disorder, generalized anxiety disorder, and attention deficit hyperactivity disorder ("ADHD") (*id*. at 59).

### B. Medical Evidence in Issue[3]

#### 1. *Medical Records Relating to Plaintiff's Back and Neck Conditions*

---

[3] The court limits its discussion to the medical evidence relevant to the two issues raised on appeal, as did the parties.

A September 5, 2013 x-ray of Plaintiff's cervical spine showed "[m]ild multilevel spondylosis … without prominent neural foraminal encroachment" (*id*. at 722). An x-ray of the same date of Plaintiff's lumbar spine showed "[m]ild endplate spondylosis," "[n]o advanced disc disease," and "[m]oderate facet arthropathy at L5-S1" (*id*. at 723).

Plaintiff saw R. Scott Cowan, M.D. at New England Orthopedic Surgeons on November 5, 2013 for chronic low back pain with "no clear etiology" (*id*. at 617). Plaintiff reported that the pain was aching in quality and rated it a 3 on a scale of 1-to-10 (*id*.). Plaintiff denied radiating leg pain, numbness, or weakness (*id*.). Plaintiff reported having had a flare-up in June, after which he had not returned to work (*id*.). According to Plaintiff, physical therapy had not been effective, but over-the-counter pain medication provided some relief (*id*.). Upon examination, Plaintiff displayed a reduced range of motion (60% of normal), but normal reflexes, normal ambulation, and a negative seated straight leg test (*id*.). Dr. Cowan ordered x-rays of the lumbosacral spine, which were obtained and reviewed that same day and were "notable for spondylitic findings without fracture or any other lesions" (*id*.). After reviewing the x-ray evidence, Dr. Cowan concluded, "I really have no diagnosis for him as the radiographs are unremarkable" (*id*.). Nevertheless, Dr. Cowan ordered an MRI to evaluate for an inflammatory lesion or any other pain generating process (*id*.).

Plaintiff underwent the MRI of his lumbar spine on January 24, 2014 (*id*. at 611-12). The impression showed "[s]pondylotic and degenerative disc changes of the lumbar spine," "foraminal narrowing … most pronounced at L3-L4 and L4-L5," with "[n]o exiting or traversing nerve root impingement" (*id*.). Dr. Cowan reviewed the MRI results with Plaintiff on January 31, 2014, at which time, he indicated that the "study … was notable only for some mild degenerative disc findings without any traversing nerve root impingement noted," and "really

unremarkable for any significant structural lesions" (*id*.). Dr. Cowan noted that for treatment, Plaintiff had undergone some physical therapy and took minimal pain medication (*id*.). He described Plaintiff as "reassured" by the MRI results and started him on a functional restoration physical therapy program (*id*.).

Plaintiff saw Paul Azimov, D.O., on August 28, 2014 for a physiatry consultation (*id*. at 739-742). In his report, Dr. Azimov notes that Plaintiff "had lumbar sacral spine MRI for chronic lower back pain in January 2014. It was generally noncontributory with evidence of mild neural foraminal stenosis and diffuse degenerative changes at multiple levels" (*id*.). "Cervical spine x-rays were done in September of 2013 demonstrating diffuse degenerative changes" (*id*.). Upon examination, Plaintiff demonstrated a reduced range of motion in both the cervical and lumbar spinal regions (*id*.). His cervical and lumbar musculature were without muscle tightness or elasticity (*id*.). He was able to go from sitting to standing position without difficulties, his gait was normal, and he was able to perform heel walk and toe walk (*id*.). Dr. Azimov ordered an epidural steroid injection, which he administered on September 12, 2014 (*id*. at 738-39). Dr. Azimov also ordered an MRI of Plaintiff's cervical spine, which was done on September 5, 2014 (*id*. at 743). The MRI revealed "[m]ultilevel bony and disc degenerative changes," protrusions of the C4-5 and C7-T1 discs, narrowing of the neural foramina at multiple levels, but no spinal cord compression (*id*.).

On June 8, 2015, Plaintiff was evaluated by Michael Rossen, M.D. at Springfield Neurology Associates for an initial neurological consultation for balance problems (*id*. at 536-39). Plaintiff reported a many-year history of neck pain, as well as upper and lower back pain (*id*.). He described the neck pain as "dull, continuous, [and] mild at baseline but sometimes severe and sharp, especially if he turns is head to one side or the other" (*id*.). He described his

back pain as intermittent, but usually present at least part of every day, and worse with physically strenuous activity (*id*.). Dr. Rossen ordered a cervical spine MRI, which was taken on June 17, 2015 (*id*. at 1010-1011). It showed "[m]ild spondylotic and degenerative disc changes of the cervical spine," with no evidence of cord compression or cervical spinal cord signal abnormality," and mild to moderate foraminal narrowing (*id*.).

### 2. *Medical Records Relating to Plaintiff's Mental Conditions*

Plaintiff received therapy from Sarah Shube, L.M.H.C., for bipolar II disorder, generalized anxiety disorder, and ADHD from July 31, 2014 through January 8, 2016 (*id*. at 947-1007, 1141-161). Plaintiff received psychiatric medications – including Ritalin and Effexor – from Geraldine A. Kasulinous, A.P.R.N., P.C., FNP-BC, from September 2014 through December 2015 (*id*. at 429-440, 520-22, 1030-32, 1075-79).

On September 26, 2015, Shube completed a Mental Impairment Opinion Questionnaire regarding Plaintiff (*id*. at 563-66). In it, she opined that Plaintiff had marked restriction of daily activities, extreme difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation of extended duration (*id*.). She indicated that, on average, Plaintiff would be absent from work more than four days per month as a result of his impairments or treatment (*id*.).

### 3. *Consultative Examination*

On July 28, 2015, Teena Guenther, Ph. D., performed a consultative psychological examination of Plaintiff (*id*. at 548-53). Plaintiff drove himself to the examination, and Dr. Guenther described him as cooperative, easily engaged, and a good historian (*id*.). Plaintiff advised Dr. Guenther that he was living alone and enjoyed cooking and preparing food, in particular making gourmet pizza (*id*.). Plaintiff reported doing his own laundry, keeping up with

his bath and shower, and making sure his bills were paid (*id*.).  He denied socializing on any

regular basis and described himself as having "poor social skills" and "a lot of anger" (*id*.).  He

described instances in the past when he would verbally lash out at others and even throw items

on the job (*id*.).  He described his mood as "always pretty much the same, blah" (*id*.).  He also

described difficulty easily interacting with others and being quick to provocation (id.).

Dr. Guenther assessed Plaintiff a Global Assessment of Functioning ("GAF") score of

56[4] (id.).  She estimated Plaintiff's intellectual abilities to be within the average range (*id*.).  She

indicated that he presented as intellectually capable of following and understanding directions,

although the ease with which he might be able to do so could be affected by reported

concentration and memory difficulties (*id*.).  She noted that he may continue to have difficulty

managing his anger and could be at risk of exhibiting some behavioral extremes (*id*.).  She

indicated that his overall ability to tolerate stress might be limited (*id*.).  Dr. Guenther diagnosed

Plaintiff with dysthymic disorder versus mood disorder, not otherwise specified; anxiety

disorder, not otherwise specified; attention deficit disorder/attention deficit hyperactivity

disorder per history; and rule out personality disorder, not otherwise specified (*id*.).  She

recommended that Plaintiff continue to see his therapist every other week and his psychiatric

medication provider monthly (*id*.).

4.  *State Agency Assessments*

Two state agency experts, John Burke, Ph. D., and Beth DiCarlo, Psy. D., reviewed

Plaintiff's records in April 2015 and August 2015, respectively (*id*. at 113-124, 139-154).  They

---

[4] A GAF score between 51 and 60 reflects "[m]oderate symptoms (e.g. flat affect and
circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational,
or school functioning (e.g. few friends, conflicts with peers or co-workers)."  Diagnostic and
Statistical Manual of Mental Disorders 34 (American Psych. Assoc., 4th ed., 2000).

assessed Plaintiff as having mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and insufficient evidence of repeated episodes of decompensation for extended durations (*id*. at 118, 147).

C.  Plaintiff's Testimony

Plaintiff testified to experiencing lower and upper back and neck pain.  Plaintiff described his lower back pain as a dull ache most of the time, but becoming a sharp pain with certain movements and becoming more severe with physical activity (*id*. at 62).  Regarding treatments, Plaintiff indicated he had tried a cortisone injection once, but it had not worked, and physical therapy, which was helpful to a limited extent (*id*. at 63).  Plaintiff testified that the pain in his lower back is exacerbated by lifting, leaning over, straightening back up, and twisting (*id*.).  Plaintiff stated that the only thing he had found to alleviate the pain was laying down and resting (*id*.).  Plaintiff testified that the pain in his upper back and neck is constant and feels like the bones in his neck are grinding together every time he turns his head (*id*. at 63-64).  According to Plaintiff, the pain becomes worse if he sits in front of a computer or at a desk (*id*. at 64).  For his upper back and neck pain, Plaintiff testified that he tried Botox injections, which did not help, and physical therapy (*id*. at 64-65).

Plaintiff testified that he was living with his mother at the time of the hearing (*id*. at 65).  He was able to drive, did his own cooking, and walked up to one mile a day for exercise (*id*. at 65-67, 69-70).  Plaintiff indicated that he was not taking any pain medications (*id*. at 68-69).  Plaintiff testified that he could sit for twenty to thirty minutes before needing to stand, and stand for 10 to 15 minutes before needing to sit (*id*. at 70).  Plaintiff was able to regularly navigate the stairs to his downstairs bedroom, albeit with some difficulty (*id*. at 72).

Plaintiff testified that he was seeing his therapist every two weeks and had started therapy due to being suicidal (*id*. at 74). He testified to being depressed and suffering from anxiety around new people or new situations (*id*. at 75). According to Plaintiff, this leads him to avoid social situations (*id*.). Plaintiff testified to having problems with concentration, focus, and memory (*id*. at 79). He indicated that the Ritalin he was taking helped with these problems (*id*.).

D. <u>Vocational Expert's Testimony</u>

The vocational expert (VE) testified that a hypothetical individual of Plaintiff's age, educational background, and work history, with an RFC for light work, with the additional limitations of:

> -no climbing, heights, ladders, hazards, dangerous machinery, crawling, foot pedals, rough terrain, twisting, or balancing;
>
> -no more than occasional stooping, bending, and kneeling;
>
> -limited to simple routine and repetitive tasks which would require concentration for two hour time periods;
>
> -no more than occasional interaction with coworkers and with the general public;
>
> -and limited to work in the lower one-third of the stress continuum, defined as no independent decision-making required and no more than occasional changes in work routine

could perform jobs as an assembler (DOT # 706.684-022), with 450 positions in Massachusetts and 50,000 nationally; an inspector (DOT # 716.687-014), with 600 positions in Massachusetts and 100,000 nationally; and a mail sorter (DOT # 209.687-026), with 400 positions in Massachusetts and 40,000 nationally (*id*. at 38-39). The VE testified that adding to the first hypothetical a restriction that the individual would need to alternate between sitting and standing every 20 minutes would reduce each of the jobs in Massachusetts and nationally by 50 percent (*id*. at 90). Finally, the VE testified that if the hypothetical individual were to miss work

11

approximately four times per month or be off task at least 25 percent of the work day, the individual would not be employable (*id*. at 90).

## V.     The ALJ's Decision

To determine whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date (*id*. at 38). At the second step, the ALJ found that Plaintiff had severe impairments consisting of: cervical and lumbar degenerative disc disease, fatty liver disease, obstructive sleep apnea, ADHD, depression, and anxiety (*id*.). The ALJ found the following impairments to be non-severe: gout, knee pain, hypertension, and kidney stones (*id*. at 42-43). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*id*. at 43). Before proceeding to steps four and five, the ALJ found that Plaintiff had the RFC to:

> perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b)[5] except he cannot perform climbing, balancing, twisting, or crawling. He can perform no more than occasional stooping, bending, and kneeling. He cannot walk on rough terrain. He must avoid heights and cannot climb ladders. He must avoid exposure to hazards such as unprotected heights and dangerous moving machinery. He is limited to simple, routine, repetitive tasks, which require concentration for 2-hour time periods. He can tolerate no more than occasional interaction with the general public and with coworkers. He can do work in the lower 1/3 of the stress

---

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567 (b).

> continuum, defined as no independent decision-making required,
> and no more than occasional changes in the work routine

(id. at 44). At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work (*id*. at 45). At step five, relying on the testimony of an independent vocational expert, the ALJ determined that Plaintiff could perform jobs found in significant numbers in the national economy taking into account Plaintiff's age, education, work experience, and RFC, and, therefore, Plaintiff was not disabled (*id*. at 46-47).

## VI. Analysis

Plaintiff argues that the ALJ, in deciding that Plaintiff was not disabled and, therefore, ineligible for benefits, erred by finding that Plaintiff was not entirely credible in his subjective complaints of pain and by failing to give appropriate weight to the opinion of his treating therapist.

### A. The ALJ's Credibility Determination

Plaintiff's principal challenge is to the ALJ's credibility determination concerning his allegations of back and neck pain caused by his impairments. The court finds that there is substantial evidence to support the ALJ's credibility determination.

In determining whether an individual is disabled, an ALJ "considers all [of a claimant's symptoms], including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). "However, statements about [a claimant's] pain or other symptoms will not alone establish that [a claimant] is disabled; there must be medical signs and laboratory findings which show that [the claimant] ha[s] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or

other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant] is disabled." *Id.*

When faced with allegations of pain or other symptoms, an ALJ follows a two-step process. "At the first step, the [ALJ] must determine whether there exists an impairment that could reasonably be expected to produce [the claimant's] pain or other symptoms." *Amaral v. Comm'r of Soc. Sec.*, 797 F. Supp. 2d 154, 161 (D. Mass. 2010) (citing SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996)). *See also* 20 C.F.R. § 404.1529(b); 416.929(b). If the claimant meets that threshold, as the ALJ determined Plaintiff did here, "the ALJ must evaluate evidence of the intensity and persistence of the symptoms, including statements from the claimant," *Johnson v. Colvin*, 204 F. Supp. 3d 396, 412 (D. Mass. 2016) (citing 20 C.F.R. §§ 404.1529(c)(1); 416.929(c)(1)), to "determine how [the claimant's] symptoms limit [his] capacity for work," 20 C.F.R. §§ 404.1529(c)(1); 416.929(c)(1). "This step requires an appraisal of the credibility of the person's statements regarding his or her symptoms and their functional effects." *Pires v. Astrue*, 553 F. Supp. 2d 15, 22 (D. Mass. 2006) (citing SSR 96-7p).

In conducting the credibility assessment, the ALJ must consider the objective medical evidence, but may not "reject [a claimant's] statements about the intensity and persistence of [the claimant's] pain or other symptoms or about the effect [the claimant's] symptoms have on [the claimant's] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. §§ 404.1529(c)(2); 416.929(c)(2). Rather, the ALJ also must "inquire into six '*Avery* factors' at an individual's hearing and consider them in his or her decision." *Pires*, 553 F. Supp. 2d at 22 (citing *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986)). Those factors are: (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating

factors; (3) type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities. *Id*. at 22-23 (citing *Avery*, 797 F.2d at 29). The factors are also set forth at 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). The ALJ "need not expressly discuss every enumerated factor," however. *Balaguer v. Astrue*, 880 F. Supp. 2d 268 (D. Mass. 2012). "*Avery* is understood to require ALJ's to consider the *Avery* factors at the hearing and in reaching their determination, but it does not require that the ALJ provide 'an explicit written analysis of each factor.'" *Hart v. Colvin*, No. 16-cv-10690-ADB, 2017 WL 3594258, at *11 (D. Mass. Aug. 21, 2017) (quoting *Vega v. Astrue*, No. 11-cv-10406-WGY, 2012 WL 5989712, at *8 (D. Mass. Mar. 30, 2012)). That said, "the ALJ must articulate specific and adequate reasons for determining that the testimony regarding the symptoms of pain is not credible, or the record must be obvious as to the credibility finding." *Rosa*, 783 F. Supp. 2d at 188 (citing *Rohrberg v. Apfel*, 26 F. Supp. 2d 303, 309 (D. Mass. 1998)). In the end, the "credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." *Frustaglia v. Sec'y of Health and Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987). *See also Anderson v. Astrue*, 682 F. Supp. 2d 89, 96 (D. Mass. 2010) ("A fact-finder's assessment of a party's credibility … is given considerable deference and, accordingly a reviewing court will rarely disturb it.").

Here, the ALJ followed the required framework for assessing Plaintiff's credibility. He heard testimony regarding the *Avery* factors and, in his decision, articulated four reasons for

finding that Plaintiff was not fully credible. Following the regulations, the ALJ did not rely solely on the medical evidence, but considered other factors as well.

First, the ALJ noted a lack of objective findings to support the claimant's subjective complaints of back and neck pain. In particular, he noted that the claimant's MRI findings were "unremarkable" (A.R. at 45). Plaintiff takes particular issue with this characterization, insofar as his lumbar and cervical MRI results showed disc bulges and disc protrusions. Plaintiff's complaint is unavailing. The ALJ included detailed discussions of the results of Plaintiff's MRIs in his longitudinal review of Plaintiff's treatment history (A.R. at 39, 41). It was not incumbent upon the ALJ to repeat those results at the point in his decision where he discussed his assessment of the credibility of Plaintiff's statements of disabling pain. In using the term "unremarkable," the ALJ was echoing Dr. Cowan's interpretation of Plaintiff's January 24, 2014 MRI results, which Dr. Cowan described as "really unremarkable for any significant structural lesions" (A.R. at 611-12). Also, as observed by the Commissioner, the Plaintiff's description of highly restrictive sitting and standing limitations are not supported by the MRI findings, which show only mild to moderate degenerative changes with no nerve root or spinal cord compression (A.R. at 60-63, 65, 69-70; 722 – 9/5/13 x-ray of cervical spine showed mild multilevel spondylosis without prominent neural foraminal encroachment; 723 – 9/5/13 x-ray of lumbar spine showed mild endplate spondylosis with no advanced disc disease and moderate facet arthropathy at L5-S1; 611-12 – 1/24/14 lumbar spine MRI showed spondylotic and degenerative disc changes of the lumbar spine with foraminal narrowing at L3-L4 and L4-L5 without nerve root impingement; 743 – 9/5/14 cervical spine MRI showed multilevel bony and disc degenerative changes with protrusions of the C4-5 disc, protrusion of C7-T1, and narrowing of the neural foramina at multiple levels; 545-46 – 6/17/15 cervical spine MRI showed mild

spondylotic and degenerative disc changes of the cervical spine with foraminal narrowing but no evidence of cord compression or cervical spinal signal abnormality).

Second, the ALJ found Plaintiff's complaints of pain less credible because he testified that he was not taking any pain medications (A.R. at 45, 69). This is an appropriate factor for an ALJ to consider in assessing a claimant's credibility regarding allegations of disabling pain. 20 C.F.R. § 404.1529(c)(3)(iv); 20 C.F.R. § 416.929(c)(3)(iv).

Third, the ALJ found Plaintiff's statements regarding the intensity and persistence of his pain inconsistent with his "wide range" of daily activities. In particular, the ALJ noted that those activities included cooking, cleaning, driving, and walking approximately ½ to 1 mile for exercise (A.R. at 45, 65, 66-67, 69, 70). These, too, were appropriate considerations. *See* SSR 96-7p at *5 (setting out guidelines for an ALJ to consider when evaluating the credibility of the claimant's statements regarding pain, including the consistency of the claimant's statements, both internally and with other information in the case record). "'While a claimant's performance of household chores or the like ought not to be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding.'" *Duffy v. Colvin*, No. 16-10719-PBS, 2017 WL 3388164, at *6 (D. Mass. Aug. 7, 2017) (quoting *Teixeira v. Astrue*, 755 F. Supp. 2d 340, 347 (D. Mass. 2010)).

Finally, the ALJ noted that Plaintiff's credibility was undermined by inconsistent statements he made concerning alcohol use and looking for work (A.R. at 45). Both of these findings are supported by substantial evidence. At the hearing, Plaintiff testified that he never was a heavy drinker (A.R. at 71). However, treatment notes from Shube reflect that, on February 13, 2015, Plaintiff smelled of beer and reported getting drunk on 4 pints of beer to cope with financial stress (*id*. at 961). In addition, at the hearing, Plaintiff denied looking for work, but

treatment notes from Shube from February 13, 2015 reflect that Plaintiff looked for work on the Futureworks website, but felt that his medical issues precluded him from heavy labor jobs (*id.*). Similarly, treatment notes from February 19, 2015, indicate Plaintiff "has looked for work and continues to look for work" (*id.* at 959).

Accordingly, the court concludes that the ALJ's determination that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his pain were not entirely credible is supported by substantial evidence. Given the deferential standard of review for credibility determinations by ALJs when supported by specific findings, the court will not disturb that finding here. *See Rosa v. Astrue*, 783 F. Supp. 2d 179, 188 (D. Mass. 2011) ("A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record." (citing *Frustiglia*, 829 F.2d at 195)).

## B. Weight Given to Opinion of Treating Therapist

Plaintiff's second assignment of error is that the ALJ erred by not assigning controlling weight to Shube's opinion as expressed in the impairment questionnaire, thereby rendering a flawed RFC (A.R. at 45). Plaintiff is wrong. Only licensed physicians, licensed or certified psychologists, and other "acceptable medical sources," including licensed optometrists, licensed podiatrists, and qualified speech-language pathologists, qualify as "treating sources," whose opinions generally are entitled to more weight and, under certain circumstances, can be afforded controlling weight. *See* 20 C.F.R. §§ 404.1502, 404.1513(a), 404.1527(c)(2), 416.902, 416.913(a), 416.927(c)(2). The record reflects that Shube is a licensed mental health counselor. As such, she does not qualify as a "treating source." Not only was her opinion not entitled to greater weight, but also, the ALJ was precluded from giving it controlling weight as Plaintiff urges. *See Pelletier v. Astrue*, No. 09-10098-GAO, 2012 WL 892892, at *4 n. 2 (D. Mass.

March 15, 2012) (noting that a licensed clinical social worker is not an "acceptable medical source" whose opinion may be given controlling weight). *See also* SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) ("[O]nly 'acceptable medical sources' can be considered treating sources, as defined in 20 C.F.R. §§ 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight") (citing 20 C.F.R. §§ 404.1527(d) and 416.927(d)).

Instead, Shube falls into the category of an "other source" within the meaning of the regulations. *See* 20 C.F.R. §§ 404.1513(d), 416.913(d). The ALJ was permitted to use the "other source" evidence from Shube to determine the severity of Plaintiff's impairments and how they affect his ability to work. *See id.* The ALJ could have assigned more weight to Shube's opinion, as courts permit an opinion from an "other source" to be given equal or greater weight than an "acceptable medical source," depending on the facts of the case. *See Taylor v. Astrue*, 899 F. Supp. 2d 83, 88 (D. Mass. 2012) (citing SSR 06-03p, at *5). However, the ALJ also had the discretion to conclude, as he did, that Shube's "other source" evidence should not be afforded great weight. *See id*; SSR 06-03p.

The record is clear that the ALJ considered Shube's opinion, as he was required to do. 20 C.F.R. §§ 404.1527; 416.927. He noted that Shube completed the mental impairment questionnaire and assessed Plaintiff with marked restriction of activities of daily living, extreme difficulties maintaining social functioning, marked difficulties maintaining concentration, persistence, or pace, and with one or two episodes of decompensation of extended duration (A.R. at 41). He noted Shube's opinion that Plaintiff would miss more than four days of work per month as a result of his impairments or treatment (*id.*). The ALJ simply assigned these opinions "little weight," as "not supported by the medical evidence of record, … undermined by the claimant's credibility issues, and … inconsistent with the claimant's range of daily activities (*id.*

at 45). On the other hand, the ALJ assigned "great weight" to the state agency consultants' opinions, as well as to the opinions of Dr. Guenther (*id*. at 45). The state agency consultants' opinions assessed Plaintiff with mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and insufficient evidence of repeated episodes of decompensation for extended durations, and the ALJ adopted these assessments. The ALJ thoroughly discussed the bases for doing so in his decision and cited the substantial evidence to support them (*id*. at 43-44).

As the ALJ explained, Shube's opinion that Plaintiff had "marked" restrictions in performing daily activities is inconsistent with Plaintiff's own statements. In a Function Report Plaintiff completed on April 9, 2015, he reported being able to prepare simple meals, do light housework, walk, drive, shop, and manage his finances (*id*. at 284-291). He reported visiting his mother occasionally, going to doctor's appointments, and running errands (*id*.). Plaintiff told Dr. Guenther on July 28, 2015, that he enjoyed cooking and preparing food, including gourmet pizza (*id*.). He said he did his own laundry, kept up with bathing and showering, made sure his bills were paid, and visited his mother (*id*.). Thus, there is substantial evidence supporting the ALJ's assessment of Plaintiff as mildly limited in this area (*id*.).

Shube's finding of "extreme" difficulties with social functioning are inconsistent with the reports of the two state agency consultants and Dr. Guenther. Dr. Guenther's GAF score of 56 supports moderate limitations, as do the opinions of Drs. Burke and DiCarlo. The ALJ accommodated Plaintiff's limitations in social functioning by including in his RFC that Plaintiff

have no more than occasional interaction with the general public and with coworkers (A.R. at 44, 551).

Shube's finding of marked limitations with concentration, persistence, and pace also is inconsistent with the record. As the ALJ explained, Plaintiff said that he could pay attention for 15 minutes and follow simple written instructions, although he does not follow spoken instructions well or handle stress or change well. Dr. Guenther reported that Plaintiff presented as intellectually capable of understanding and following instructions, although Plaintiff had described increasing difficulty with concentration and memory. Dr. Guenther also indicated Plaintiff may have a limited overall ability to handle stress. The ALJ accommodated these limitations by restricting Plaintiff to work involving simple, routine, repetitive tasks, which require concentration for two-hour time periods, and requiring no independent decision-making and no more than occasional changes in routine.

The ALJ also gave less weight to Shube's opinion insofar as it was based, in part, on Plaintiff's subjective reports, which were undermined by his credibility issues. This was an appropriate consideration. *See Mason v. Astrue*, No. 12-30054-KPN, 2013 WL 2247583, at *4 (D. Mass. Feb. 1, 2013) ("An administrative law judge can grant little weight to a doctor's opinion that is based mainly on subjective complaints." (citing *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001)).

Accordingly, the court concludes that the ALJ did not err in assigning little weight to Shube's opinions as expressed in the mental impairment questionnaire and great weight to the opinions of the state agency consultants and Dr. Guenther.

VII.    Conclusion

For the reasons stated, Plaintiff's motion for judgment on the pleadings (Dkt. No. 13) IS

DENIED, and the Commissioner's motion for an order affirming the decision (Dkt. No. 17) IS

GRANTED.

It is so ordered.

Sept. 18, 2017                                    /s/ Katherine A. Robertson
                                                 KATHERINE A. ROBERTSON
                                                 United States Magistrate Judge